Lyon v. Howard S. Taylor for the use of H. Worcester.

1. *Pleading—Demurrer to Special Pleas.*—It is not error to sustain a demurrer to a special plea, where the whole question can be litigated under the general issue, and all the evidence that could have been introduced under the special plea was admitted in evidence under the general issue, and the case fully considered under the facts by the court.

2. *Agency.*—If a person hold himself out to be acting as the agent and for the benefit of and for the signers of a syndicate, the law will not permit him to repudiate his agency and speculate out of the partners of such signers in a matter in which they all have a common interest.

3. *Agency—Right of an Agent to Speculate out of his Principal.*—An agent has no right to speculate out of his principal, and where he purchased

a piece of property for his principal, even if authorized to pay a certain price, he has no right to purchase it at a less price and claim the difference as his own. The principal has a right under such circumstances to the benefit of the more favorable price for which the property is bought.

4. *Practice—Suits for the Use of Another—Motion to Dismiss.*—O. L. made a note payable to T. and T. indorsed to W. for collection. W. brought a suit in the name of T. for his use, and T. moved to dismiss the suit; thereupon, leave was granted by the court to W. to file a bond to indemnify the said T., which was accordingly filed, and the court overruled the motion to dismiss the suit. *It was held,* that as such suit was being prosecuted in the name of T., the payee of the note, and not in the name of W., the assignee, the court correctly decided the motion, so far as the motion is concerned.

**Memorandum.**—Assumpsit on promissory note. Pleas : General-issue and denial of assignment. Appeal from the Circuit Court of Kankakee County; the Hon. CHARLES R. STARR, Judge, presiding. Heard in this court at the May term, 1893. Opinion filed December 12, 1893.

The statement of facts is contained in the opinion of the court.

APPELLANT'S BRIEF, M. B. & F. S. LOOMIS, ATTORNEYS.

Taylor, the trustee, had no authority to indorse or turn over one of these notes to Worcester. He was holding them in a fiduciary capacity, with express and repeated instructions not to let them go out of his hands. They were payable only to him, not even to his order, and were made nonnegotiable, with the consent and at the suggestion of Worcester himself, so that they should not be transferred to any one else. Under such circumstances the indorsement and delivery of the note sued upon by Taylor to Worcester, was a breach of the trust confided in Taylor, and a fraud upon the rights of appellant. Such an agreement, or transfer, being a breach of trust, will not be enforced. Perry on Trusts, Sec. 787; Ord v. Noel, 5 Mad. 438; Wood v. Richardson, 4 Beav. 174; Mortlock v. Buller, 10 Ves. 315; Dawes v. Betts, 12 Jur. 709.

It may be laid down generally, that the rules of the court are the rules of honesty and fair dealing, and that no party to an illegal or fraudulent contract can derive any

benefit from it, and that all persons who obtain possession of trust funds with a knowledge that their title is derived from a breach of trust, will be compelled to restore such trust funds. Lewin on Trusts, 862; Lathrop v. Bampton, 31 Cal. 17. The rights of the *cestui que trust* can not be impaired by a conveyance of the trustee to a third party, for a different purpose than that declared by the trust, and when the purchaser is affected with notice of the facts which in law constitute the breach of trust, the transfer is void as to him. Swift v. Castle, 23 Ill. 209; Shepherd v. McEvers, 4 Johns. C. (N. Y.) 136; Wormley v. Wormley, 8 Wheat. 421; Mechanics' Bank of Alexandria v. Seton, 1 Pet. 299.

Notice of the trust before the conveyance converts the purchaser into a trustee. Perry on Trusts, Sec. 829. So, where trust money is followed into the hands of a person who receives it by collusion, or with express notice of the trust, he becomes himself a trustee. Perry on Trusts, Secs. 167, 840; Ernest v. Croysdill, 6 Jur. (N. S.) 740; Rolfe v. Gregory, 11 Jur. (N. S.) 97.

It will not be a sufficient answer to this position to say that although appellee got possession of the note by fraud, misrepresentation and concealment—although he made use of his confidential and fiduciary relation to the parties concerned for that purpose, yet this can not be made use of as a defense in an action at law, but resort must be had to equity. Even if appellee had the right originally to insist upon the question of fraud being litigated in a court of chancery, he waived that right when he went into the whole question in an action at law. Blanchard v. Brown, 3 Wall. 248.

But it is unquestionably true that fraud vitiates all acts between the parties, and is cognizable in a court of law as well as equity. Jamison v. Beaubien, 3 Scam. 113; Lowry v. Orr, 1 Gilm. 70; Rogers v. Brent, 5 Gilm. 573; Gregg v. Sayre, 8 Pet. 244; Swayze v. Burke, 12 Pet. 11.

WHEELER & HUNTER, attorneys for appellee.

OPINION OF THE COURT, LACEY, J.

This suit is an action of assumpsit based upon a promissory note given by appellant to appellee, in the sum of $500, due in one year after date, with six per cent interest from date, not negotiable, dated January 1, 1891. The real date of the note, however, was May 9, 1891. Indorsed on the back of the note is payment for thirty dollars interest, and sixty dollars principal.

At the trial in the court below, Howard S. Taylor, the payee named in the note, moved to dismiss the suit. Thereupon leave was granted by the court to H. Worcester, to whom it had been indorsed for collection, to file a bond to indemnify the said Taylor, which was filed December 12, 1892, whereupon the court overruled the motion of said Taylor to dismiss the action. On the same day the appellant filed two additional special pleas, in addition to the general issue already filed, to which special pleas the court sustained a demurrer. Appellant abided his plea.

The jury was waived by agreement of the parties and the cause tried by the court.

A point is made by counsel for appellant, that the court erred in overruling the motion of Taylor to dismiss the suit, apparently under the mistaken idea that the suit was being prosecuted in the name of the usee, H. Worcester, arguing that the legal title did not pass to the usee.

We need not further comment upon this point than to say, that this suit is being prosecuted in the name of Taylor, the payee of the note, and not that of Worcester, to whom it was indorsed for collection; therefore, the authorities cited are not applicable. The court, therefore, decided correctly if the reason assigned by counsel for grounds for dismissal are the only ones that can be urged.

It is also urged that the court erred in sustaining the demurrer to appellant's special pleas. We do not deem it necessary to go into a consideration as to whether those pleas were good or not, for the reason that the whole question was litigated under the general issue and all the evidence that could have been introduced under the special pleas was admitted in evidence under the general issue, and

the case fully considered on the facts by the court.  Cooke v. Preble et al., 80 Ill. 382.  We shall therefore consider the case on its merits according to the evidence preserved in the record.

The defense consists in an allegation of fraud, that the usee, Worcester, and two others, is alleged to have perpetrated upon the appellant in certain land transactions in and about laying out certain town lots in the township of Thornton, county of Cook, and Harvey addition syndicate, or more particularly the purchase of forty acres of land on which the addition was laid out.

It appears from the evidence in this case that some time in October or November, Hannibal Worcester, the usee, a banker at Momence, Kankakee County, Illinois, J. Pembrook Bishop, a real estate operator in Chicago, and George M. Bennett, of Grant Park, Kankakee County, Illinois, conceived a scheme of forming a syndicate for the purpose of purchasing and subdividing for sale, a tract of land at South Harvey, Cook County, Illinois, consisting of eighty acres of land, a part of which is the land out of which transactions hereinafter mentioned arose and the note in question grew.

In the latter part of October, 1890, the parties named above commenced negotiations for the purchase of eighty acres of land, and on the 5th of November they had acquired by contract the west forty acres of the land near Harvey, and also had some kind of a contract or option purchase for the east forty, the record not disclosing the exact nature of it.  The contract was made between Eugene Cary, the owner of the land, and H. A. Haynes, who had no interest in it and who was a lawyer in Bishop's office, and engaged in the latter's business; who made the contract in his own name, but really for the benefit of the three parties.  He was to pay $26,000 for the east forty, and the contract was written up and placed by both parties in the Illinois Trust and Savings Bank on November 5, 1890.

Worcester and his party placed a certified check of $1,500 with the contract in the bank to be held as some kind of

security for the fulfillment of the contract of purchase, the exact nature of which is not disclosed by the evidence, except that the $1,500 was not to be a present payment. As soon as these contracts were secured, Bishop, Worcester and Bennett started out to form a syndicate to whom they might sell this property for the purpose of laying it out into lots and selling it, Bishop, it appears, being an expert in such matters, having been engaged in that kind of business before. The proposition was to sell the land to a syndicate in shares at the rate of $1,200 an acre or $1,000 a share. It would take ninety-six shares at $1,000 each to cover the eighty acres. They proceeded on that basis for a while, but succeeded in getting only seventy-two shares subscribed, and not having succeeded in getting shares enough subscribed they suggested that they would hold the balance of stock themselves. Some of the stockholders objected because they did not want the land incumbered. The first scheme was therefore abandoned, and they organized the syndicate proper on the east forty acres of the land, and the organization of the syndicate on that forty was perfected about November 24, 1890, and all the shares were retired except forty-eight. The deed was obtained from Cary to one Howard S. Taylor, on the 4th of March, 1891, with the intention of his becoming the trustee of the syndicate, which he did by resolution of the shareholders on the 13th of April, 1891. The terms of the subscription to the syndicate were that each subscriber should pay down $500 in cash, and the balance on credit, and it appears from the evidence that at the time Taylor took the deed from Cary, this money was used by the three syndicate makers and Taylor, to pay off all the cash payments of purchase price up to that time of the forty acres of land, $16,000, without applying the certified check of $1,500 on the purchase money, or if it was applied, Bishop, Worcester and Bennett were reimbursed that sum. There was something over $23,000 paid in by the shareholders in the syndicate, and the difference between that and the $16,000 paid on the land was expended in various ways or kept by the three syndicate formers, not fully

shown by the evidence. Taylor, at the time of receiving the deed from Cary, executed his note for $10,000 to the latter, together with a mortgage on the east forty to secure it.

On April 20, 1891, Worcester and Bishop made a trade by which Bishop turned over to Worcester all of his equity in $24,000 of deferred payments, which the contract declared was owing from a certain syndicate which had purchased the east half of the above described eighty acres, and which said deferred payments, as the contract recited, were payable to the trustee of the syndicate. Bishop, the party of the first part named in the contract, was to assume the payment of all commissions due L. O. Gilliland, earned in acting as broker for the purchase of said property, and was to be allowed to retain $1,474.63, then in his possession.

Worcester agreed to and gave a quit claim deed to the west half of the eighty to Bishop. This eliminated Bishop's interest from the syndicate in question and Worcester's interest in Bishop's half of the eighty. Bennett, previous to this, had sold out his interest to Worcester and Bishop. Bishop was elected one of the directors of the syndicate, and as one of the executive committee with Ed. Lyons and Worcester, and also was agent for the sale of the lots and continued to take an active part as one of the executive committee of the syndicate. Worcester now having become the owner of the $2,400, as he supposed, commenced to plan some means of collecting it out of the shareholders as it was suggested, and a plan was fixed upon to get the different shareholders to give their individual notes payable to Taylor, the trustee, so that Worcester might get possession of them and collect them, if it became necessary, that is, if the hopes of the shareholders to sell enough of the lots to pay off all the indebtedness and relieve them from paying their deferred payments were not realized.

It may be stated here that the evidence shows that the appellant and nearly all, if not quite all, of the members of the syndicate were entirely ignorant, up to this time, that any of this indebtedness was claimed by Worcester, or that he

was seeking to collect it for his own benefit. This fact was studiously concealed from the shareholders.

In pursuance of the plan of procuring the personal notes of the shareholders, a meeting of the directors was called in Chicago, April 13, 1891, and a resolution was adopted instructing Taylor, the trustee, to procure non-negotiable notes to secure the balance of the payments. Consequently, on April 28th, after the trade between Bishop and Worcester, under the direction of Bishop, a circular was composed and signed by Bishop, by which the stockholders were notified to come in and give their notes for the deferred payments on their shares, according to the resolution. The circular bore date April 28, 1891. It was a peculiarly oily and plausible composition. It told the shareholders that the, Harvey addition syndicate was complete, and that all the shares had been taken; that the sale of lots had commenced and that, as they had been informed when they had purchased their respective shares, it was confidently believed that their notes would never be presented for collection, "as we (the subscribers) expect that the income from the sale of the lots will more than meet the deferred payments by the time that they become due. Still, it is necessary to the welfare of each member of the syndicate, that the entire syndicate shall be secured against all contingencies and the board of directors has accordingly ordered that the deferred payments of each member be evidenced by notes at this time."

It will be noticed that there was not a word said in this circular about any part of the notes being desired for the benefit of Worcester, which was the real purpose. At a meeting of the stockholders at Grand Park, May 9, 1892, where were present, Taylor, the trustee, and Worcester, it was explained to the shareholders of the syndicate that it was necessary that these notes should be given for the protection of Taylor, who had given his notes for $10,000 to Judge Cary, to secure the deferred payments on the land, and they were appealed to to assist him or reimburse him in case the land did not sell. Worcester also said that "Taylor has got to be protected by the syndicate."

Not a word in all that meeting was said about Worcester having any claim.

The notes were then given as stated, the one in suit being one of them.

Shortly afterward Worcester procured all of the notes to be indorsed over to him by Taylor, for collection, excepting $10,000 of them, which Taylor retained to secure himself against the Cary note, and afterward between $3,000 and $4,000, having been collected from parties purchasing lots of the syndicate, which, so far as the evidence shows, was all that was ever realized out of the grand scheme, and paid to Cary.

Worcester drew an equal amount of notes from Taylor, leaving in his hands only $6,600.

Another fact appears—that while Worcester and Bishop held shares in the original intended organization, on the eighty acres, that when the reorganization took place on the forty, Worcester took no shares in the new syndicate, but afterward acquired a share.   The above are the main facts in the case, except as to the attitude borne by Worcester, the *cestui que use*, and his two partners, to the balance of the syndicate in the transaction of the purchase of the land. They claim that they purchased it on their own account and sold it to the syndicate, while on the other hand the appellant through his attorney insists that they were purchasing the land as the agent of the syndicate and for its benefit, and so represented and ostensibly acted; that they sustained the fiduciary relation of an agent to his principal.

The proper decision of the case rests upon the determination of this question.   Did the three men proposing the formation of the syndicate hold themselves out to be acting for the benefit of and for the signers of the syndicate?   If they did, then the law would not permit them to repudiate such agency and speculate out of their partners in a matter in which they all had a common interest.   We think the evidence on the part of the appellant clearly shows that they acted and pretended to act, in relation to the original purchase of the land, for the benefit and for the proposed syn-

dicate at the time it was being formed, until it was finally disclosed, about the time of the commencement of this suit, that Worcester and his two associates were the owners of the land themselves, or at least had some kind of option on it at $600 an acre, and were secretly and clandestinely unloading it upon the syndicate, of which appellant was one, at nearly double that amount. The evidence shows that the title to the land in question, or rather the contract for the purchase of it, was held by one Haines, the agent of Bishop, Worcester and Bennett; and that no one disclosed that these parties claimed to be the owners of the land out of which the syndicate was to be formed; and this fact was studiously and carefully concealed from the members of the proposed syndicate. It was represented to them that the land would cost them $1,200 an acre, and they, the formers of the syndicate, would procure the title for that sum, not disclosing at the time that they themselves had control of the title at $650 per acre.

It further appears that not a dollar had been advanced by them on the purchase of the land. They had only put up $1,500 as a pledge. And finally, when the forty-eight signers of the syndicate had advanced $23,000, this sum was used in payments for the purchase price of the land and the three parties were not out one dollar for it. It would be preposterous to suppose that if the signers of the syndicate had known that they were to pay for this land, and in addition, pay $600 per acre to these three men, that they would ever have gone into such a transaction. It does not matter that they were told by the syndicate formers that the land would cost $48,000, for the signers were led to believe that that was the least price which the men proposing the syndicate could procure it at. They represented that the title to the land was yet to be procured; that the land belonged to somebody in Iowa, and in order to hasten the formation of the syndicate, they represented that the owner was about to raise the price, which was entirely false. It is true that Bishop, Worcester and Bennett attempt, in a certain way in their evidence, to contradict the fact of their agency.

Bishop testifies in his direct examination, that at the meeting of the syndicate November 24, 1890, he represented and stated to them that he was selling the land to them; that he never represented to any one but that *they* were selling the land to the syndicate. But on cross-examination, he could not remember to whom he made the statement, and could not say that he ever stated at any of the meetings of the stockholders or shareholders of the syndicate that he was selling the land to them, "not just in that way"—"never made the exact statement" that he was selling the land to them. So it appears from his own statements that he knew that the syndicate were laboring under the impression that he and the others were purchasing the land for the syndicate and not selling it to them as their own. Besides that, Bennett, one of the partners, testifies that Bishop, in the presence of Worcester, requested him not to divulge to any of the shareholders the price paid for the land.

Bennett swears that at no meeting of the board of directors or the syndicate, did he or Bishop or Worcester represent that they were buying the land for the syndicate. This we think is a mere evasion, for it is evident that the syndicate so understood it, and it was not necessary, in order to keep up the deception, for Bennett to make a positive statement of that kind to its members. If this was not the case, why was so much pains taken to secrete the fact that they were the real owners of the land and making the sale for their own benefit?

Worcester also swears that he never stated to appellant or any one else that he and his associates were buying for the syndicate. He says: "I told the members of the syndicate that the land would cost them $1,200 an acre. I told them that the land cost them $1,200 per acre." He further states that "Mr. Lyon (appellant) came to me at Momence one time and said he saw a notice in the paper of land in that vicinity at $600 per acre. I told him there was a good deal of difference what the location of the land was." Mr. Worcester further admitted telling John C. Mater, who had been informed of the fact that the land only cost $650 per

acre—" not to tell that around Momence and Kankakee, because the shares had been sold there for $1,000 apiece;" that " if it was known that Mater was in on the ground floor it might raise a disturbance."

The evidence of these parties convinces us even more strongly that a gross fraud and deception was intended to be, and was practiced upon their associates in the syndicate; that Worcester and company, by their deep, underground, mole-like transactions, and by cunning and trickery, induced these parties to go into this scheme, ostensibly for the benefit of all, and by these means made them believe that they could and would procure the title, as their agents, or the agents of the syndicate about to be formed, for the lowest price for which it could be had, and that that was $1,200 per acre; at the same time secreting the fact that they were the owners of or controlled the title, and that they were selling the land to them.

The law is that an agent has no right to speculate out of his principal and that where an agent purchases a piece of property for his principal, even if authorized to pay a certain price, he has no right to purchase it at a less price and claim the difference himself as his own. The principal has a right under such circumstances to the benefit of the more favorable price for which the property is bought.

In this case Worcester, the *cestui que use*, and his partners, having represented that the title of the property was in another, and led plaintiff and the other signers of the syndicate to believe that they would procure it for them for the benefit of the syndicate, they are in equity and good conscience estopped from afterward claiming that they themselves were the owners of the land and selling it on their own account. It is true, that a very few of the signers of the syndicate, at or after the syndicate had been formed, understood, or partly understood, the relation which Worcester and company bore to the title of the land, and the price they gave, but these parties were so informed by these men, for the purpose of using them as tools and assistants in carrying out the fraud intended, and being perpetrated upon

Lyon v. Worcester.

the balance of the syndicate. In fact the evidence shows that the land in question was purchased with a view of selling it to, and unloading it upon a syndicate expected to be formed; that a very small amount of money was advanced and everything was carefully prepared for perpetrating the intended fraud which was afterward attempted to be carried out, in the manner of forming the syndicate in question. Worcester, who is using the name of Taylor, the trustee, to collect those notes for his own benefit, has no right to any of them. The notes which he holds all represent the illegal profits which he and his associates are attempting to realize by means of their fraudulent practices, and the note in question being one of them, is not collectible for his benefit, and neither is the nominal plaintiff, Taylor, attempting to do so, and moved the court below to dismiss the suit, which was refused, probably rightfully, at the time, but after the evidence was all introduced the court was enabled to see that the suit ought not to be prosecuted, and should have been dismissed on its own motion. There is a debt for which the land is legitimately pledged, for which Taylor, the payee of the notes, has given his personal notes to the grantor, for the payment of the purchase money, and these notes were given for the purpose of securing him against any sum he might be compelled to pay by reason thereof, and he as such trustee has a right to hold the notes for the purpose for which they were given, and in equity they should all be assessed *pro rata* to pay any subsequent defalcation that might arise as respects Taylor's claim. It would apparently not be proper to allow the appellant to defeat the action on the note for the above reason, for that would be a bar to any liability on it whatever.

Therefore the court below should have dismissed the present suit on the motion of Taylor, or on its own motion. Therefore the judgment of the court below is reversed, and the cause dismissed in this court, without prejudice to Taylor, the nominal plaintiff, in case hereafter he has any right to enforce the payment of any portion of the note sued on for his own benefit as trustee on his liabilities. Reversed.